IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

THOMAS  E. STURDIVANT  #148248,      :

      Plaintiff,      :

vs.      :      CIVIL ACTION 08-0634-WS-C

SHERIFF JAMES LOVETTE,      :

      Defendant.      :

REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis filed a Complaint under 42 U.S.C. § 1983.  This action was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on Defendant's Motion for Summary Judgment (Docs. 36, 37), and Plaintiff's Response thereto.  (Doc. 45).  After consideration of the pleadings and the evidence presented by the parties, and for the reasons set forth below, it is recommended that Defendant's Motion for Summary Judgment be granted and that Plaintiff's action against Defendant Lovette be dismissed with prejudice.

I.  SUMMARY OF ALLEGATIONS

From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation.

1. At the time of the incident made the basis of this litigation, Plaintiff was an inmate incarcerated at the Choctaw County Jail in Butler, Alabama.  (Doc. 1 at 4-6,

Complaint).

2. On or about July 17, 2007, Plaintiff intentionally hit a steel wall with his right hand, resulting in a fracture of the fifth metacarpal.  (Doc. 36, att. 5 at 21, 25, Medical Records of Dr. Keith Guinn; Doc. 45 at 22, Plaintiff's Response to Special Report).

3. Plaintiff was treated by Dr. Keith Guinn, who placed his hand in a cast.  (Doc. 36, att. 5 at 2-25).

4. On or about August 14, 2007, Plaintiff was involved in an incident in which he injured his lower back and buttocks and was taken by ambulance to the hospital.[1] (Doc. 36, att. 5 at 21).

5. According to Plaintiff, upon return from the hospital, he was placed in an 8' x 4' holding cell, without a bunk, without running water, and with only a hole in the floor to use as a toilet.  (Doc. 1 at 7).

6. Plaintiff spent approximately twenty-eight days in the holding cell and was allowed to take a shower on the fifteenth day.  (Id. at 7-8; Doc. 45 at 18, Plaintiff's Response to Special Report).  Plaintiff was released from the holding cell on or about September 11, 2007.  (Doc. 1 at 8).

7. During his twenty-eight day incarceration in the holding cell, Plaintiff was taken to see Dr. Guinn twice for follow up examinations of his hand, on August 22, 2007, and September 5, 2007.  (Doc. 36, att. 5 at 5).

---

[1] The details of this incident, which led to Plaintiff's disciplinary detention in the holding cell, are unclear from the record.  (Doc. 36, att. 1 at 2, Affidavit of Sheriff Lovette).

2

8. After being released from the holding cell on September 11, 2007, Plaintiff's next scheduled appointment with Dr. Guinn was September 19, 2007. (Doc. 1 at 7; Doc. 36, att. 5 at 19, 25).

9. Plaintiff was not taken to see Dr. Guinn until November 8, 2007, approximately seven weeks late, at which time Dr. Guinn removed the cast from Plaintiff's hand and noted that the fracture had healed, but there was a "possible permanent . . . atrophy of muscle." (Doc. 36, att. 5 at 19). Dr. Guinn instructed Plaintiff to do range of motion exercises to build strength in his hand. (Id.).

10. On or about January 21, 2008, Plaintiff was placed in the jail's holding cell for approximately three to four hours.[2] (Doc. 45 at 11).

11. On January 23, 2008, Plaintiff again intentionally hit a steel wall with his right hand in a deliberate attempt to re-fracture it and was taken back to see Dr. Guinn who found that the fifth metacarpal had been re-fractured. (Id. at 31).

12. Dr. Guinn splinted Plaintiff's hand and referred him to an orthopedic surgeon, Dr. Brian Claytor at the University Orthopedic Clinic in Tuscaloosa, Alabama. (Doc. 36, att. 6 at 2, 10, Medical Records of Dr. Brian Claytor).

13. On February 6, 2008, Dr. Claytor performed surgery, placing pins in Plaintiff's

---

[2] In his Complaint, Plaintiff states that this event occurred on February 21, 2008, but it appears from Plaintiff's response to Defendant's Motion for Summary Judgment that it occurred on January 21, 2008. (Doc. 45 at 11; Doc. 1 at 9; Doc. 36, att. 3 at 2, Incident Report). The record reflects that, on January 21, 2008, Plaintiff was found intoxicated and in possession of a bottle of alcohol in his cell. (Doc. 36, att. 3 at 2). However, Plaintiff alleges that, on February 21, 2008, he was placed in the holding cell because he "rebroke" his hand, and the jailer thought that he was on drugs. (Doc. 1 at 9). In either case, Plaintiff's detention in the holding cell appears to have been disciplinary in nature.

hand to correct the re-fracture, resulting in "appropriate" overall alignment of the finger. (Id. at 10, 12-13).

14. On February 21, 2008, Plaintiff again intentionally hit a steel wall multiple times with his right hand in an effort to realign the pins that he believed had dislodged. Plaintiff was taken back to see Dr. Guinn.  (Doc. 36, att. 5 at 14, 32-33).

15. Dr. Guinn put a splint on Plaintiff's hand and referred him back to Dr. Claytor. (Id. at 33).

16. On March 5, 2008, Dr. Claytor examined Plaintiff and noted: "[o]verall fracture remains in acceptable alignment although I think some of the alignment has been lost due to the patient's repeated injuries whether these are intentional or unintentional." (Doc. 36, att. 6 at 14).

17. On March 19, 2008, Dr. Claytor saw Plaintiff and removed the pins from his hand, noting that the "[a]lignment overall is good."  (Id. at 37).  Dr. Claytor instructed Plaintiff to continue using his splint to protect his hand from further injury.  (Id.).

18. Dr. Claytor examined Plaintiff on April 1, 2008, and one final time on April 22, 2008, noting that the fracture had healed and that Plaintiff had "some mild malrotation" of the fifth metacarpal but that the "final alignment is much improved."  (Id. at 17).

19. Plaintiff was transferred from the Choctaw County Jail to the Bibb County Correctional Facility sometime prior to filing this lawsuit on October 29, 2008.  (Doc. 1).

## II.  PROCEDURAL ASPECTS OF THE CASE

4

1. On October 29, 2008, Plaintiff filed the present § 1983 action against Defendant Sheriff James Lovette,[3] alleging inadequate medical treatment for his hand and unconstitutional conditions of confinement relating to his detention in the jail's holding cell, for which he seeks compensatory damages.[4]  (Doc. 1 at 4, 6).

2. In his Answer and Special Report filed on June 12, 2009, Defendant Sheriff Lovette denies Plaintiff's allegations and asserts the defenses of absolute and qualified immunity.[5]  (Docs. 36, 37).

---

[3] Plaintiff also sued Assistant District Attorney Bradley Ezell.  (Doc. 1 at 4).  In its Order of February 19, 2009, the Court adopted the undersigned's Report and Recommendation dismissing all of Plaintiff's claims against Defendant Ezell as frivolous.  (Docs. 9, 15).  The Court also dismissed Plaintiff's deprivation of property claim against Defendant Lovette as frivolous. (Id.).

[4] It is unclear from Plaintiff's Complaint whether he seeks injunctive relief related to his medical care or conditions of confinement claims.  In any event, because Plaintiff is no longer incarcerated at the Choctaw County Jail, any claims for injunctive and declaratory relief related to that incarceration are moot.  See Mosley v. Bishop, 2009 WL 1564778, *2 n.4 (S.D. Ala. 2009) ("'[A]n inmate's request for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once an inmate has been transferred.'") (citations omitted).

[5] Plaintiff does not specify whether he is suing Defendant Lovette in his official or individual capacity or both.  Thus, the Court will consider both.

As a state officer, Sheriff Lovette is absolutely immune from suit for damages in his official capacity.  See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment); Turquitt v. Jefferson County, Ala., 137 F.3d 1285, 1288-89 (11th Cir. 1998) (a county sheriff acts as a state officer when supervising inmates and operating county jails).

In addition, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  Until recently, the Court followed the mandatory procedure of Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part, Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009), which required the Court to determine whether the plaintiff's allegations, if true, established a constitutional violation and, if the first step was satisfied, to determine whether the right at issue was clearly established at the time of the alleged

3. On June 15, 2009, the Court ordered that Defendant's Answer and Special Report be treated as a Motion for Summary Judgment.  (Doc. 39).

4. On August 19, 2009, Plaintiff filed a response to Defendant's Motion for Summary Judgment.  (Doc. 45).

Defendant's motion and Plaintiff's response thereto are now before the Court.

## III.  SUMMARY JUDGMENT STANDARD

1. In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.

2. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c).

3. The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party.  Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989).

4. However, Rule 56(e) states that:

---

misconduct.  While that procedure is now discretionary, as opposed to mandatory, see Pearson, id., the Court finds it beneficial in this case.  Having found herein that Plaintiff's allegations do not establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity."  Saucier, 533 U.S. at 201.

> an adverse party [to a motion for summary judgment] may not
> rest upon the mere allegations or denials of the adverse
> party's pleading, but the adverse party's response, by
> affidavits or as otherwise provided in this rule, must set forth
> specific facts showing that there is a genuine issue for trial.  If
> the adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 325-27.

5. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted).

6. "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

## IV.  DISCUSSION

1. As discussed above, Plaintiff seeks redress in this action pursuant to 42 U.S.C. § 1983 for alleged constitutional deprivations arising out of the medical treatment that he received at the Choctaw County Jail after fracturing his hand on or about July 17, 2007 (Doc. 1 at 7; Doc. 36, att. 5 at 25), and, separately, arising out of his detention in a holding cell for approximately twenty-eight days in 2007 and for three to four hours in 2008.  (Doc. 1 at 7-9; Doc. 45 at 18).

7

2. Section 1983 provides in pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (1994).

3. In addressing Plaintiff's claims brought under § 1983, the Court begins its analysis "by identifying the specific constitutional right allegedly infringed. . . ." Graham v. Connor, 490 U.S. 386, 394 (1989).

4. At the time of the incidents made the basis of this litigation, Plaintiff was being held in the Choctaw County Jail on three counts of first degree rape and three counts of sexual abuse of a child under the age of twelve.  (Doc. 36, att. 1 at 2; Doc. 36 at 1, Special Report).

5. Plaintiff was on probation at the time of his arrest, and his probation was revoked as a result of the new charges.  (Doc. 36, att. 1 at 2)

6. It is unclear from the record whether, at the time of the incidents made the basis of this litigation, Plaintiff was being held in the Choctaw County Jail as a pretrial detainee, in which case the Fourteenth Amendment applies to his claims, or as a convicted prisoner, in which case the Eighth Amendment applies to his claims.  However, in either case, the result is the same.

7. "[I]t makes no difference whether [the plaintiff] was a pretrial detainee or a

8

convicted prisoner because 'the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving . . . pretrial detainees.'" Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) (citations omitted).  See also Danley v. Allen, 540 F.3d 1298, 1306 (11th Cir. 2008) ("Pretrial detainees, who are not protected by the Eighth Amendment, can bring the same claims under the Fourteenth Amendment.").

8. With respect to Plaintiff's medical care claim, "the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner; both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to serious medical needs."  Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 n.6 (11th Cir. 1997).

9. In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983.

10. To meet the objective element required to demonstrate a denial of medical care

in violation of the Eighth Amendment, a plaintiff first must demonstrate the objective existence of a "serious" medical need.  Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (1994), overruled in part on other grounds, Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002).

11. "[A] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill, 40 F.3d at 1187 (citations omitted).

12. "[T]he medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm.'"  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quotation marks and citations omitted).

13. Next, in order to meet the required subjective element of an Eighth Amendment denial of medical care claim, a plaintiff must demonstrate "deliberate indifference" to a serious medical need.  Hill, 40 F.3d at 1186.

> In Estelle, the Supreme Court established that "deliberate indifference" entails more than mere negligence.  Estelle, 429 U.S. at 106, 97 S. Ct. 285; Farmer, 511 U.S. at 835, 114 S. Ct. 1970.  The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added).  In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk;

(3) by conduct that is more than mere negligence."
McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258
(stating that defendant must have subjective awareness of an
"objectively serious need" and that his response must
constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46 (emphasis in original).

14. "Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted).

15. "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Id.; accord Lancaster, 116 F.3d at 1425 (applying the Fourteenth Amendment).

16. "The tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Hill, 40 F.3d at 1188 (emphasis in original) (quoting Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994)).

The "seriousness" of an inmate's medical needs also may be
decided by reference to the *effect* of delay in treatment.
Gaudreault, 923 F.2d at 208; Monmouth County, 834 F.2d at
347. Where the delay results in an inmate's suffering "a life-
long handicap or permanent loss, the medical need is
considered serious." Id.

Hill, 40 F.3d at 1188 (emphasis in original).

11

17. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." Id. (emphasis added).

18. With respect to Plaintiff's conditions of confinement claim, the law is clear that "the Constitution does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. 337, 349 (1981).

19. All that is required under the Eighth Amendment is that prison officials "ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the safety of the inmates[.]'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citations omitted); see also Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11th Cir. 1985) (finding that the Eighth Amendment requires that a prisoner receive "reasonably adequate food, clothing, shelter, and sanitation.").

20. Prison conditions constitute cruel and unusual punishment when they result in the "unquestioned and serious deprivation of basic human needs." Rhodes, 452 U.S. at 347.

21. In order to prevail on an Eighth Amendment claim alleging inhumane conditions of confinement, an inmate must make both an objective and a subjective showing.

22. The objective component requires the Court to look to the "contemporary standard of decency" to determine whether the challenged conditions resulted in a

deprivation of "the minimal civilized measure of life's necessities" or "basic human needs." Rhodes, 452 U.S. at 347.

23. "[E]xtreme deprivations are required to make out a conditions-of-confinement claim," "[b]ecause routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society[.]'" Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citations omitted).

24. "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Wilson v. Seiter, 501 U.S. 294, 305 (1991).

25. The subjective component requires that the prison official have been "deliberate[ly] indifferen[t]" to a substantial risk of serious harm. Farmer, 511 U.S. at 828-29.

26. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

27. Moreover, "[a] plaintiff must also show that the constitutional violation caused his injuries." Marsh v. Butler County, Ala., 268 F.3d 1014, 1028 (11th Cir. 2001).

28. For the reasons set forth below, the Court finds that each of Plaintiff's claims

fail as a matter of law.

    A.    <u>No Respondeat Superior Liability</u>.

    29. As discussed above, Plaintiff has sued Defendant, Sheriff Lovette, for inadequate medical care for his hand and for detaining him in inhumane conditions in the jail's holding cell for approximately twenty-eight days in August and September of 2007 and for several hours on January 21, 2008.  (Doc. 1 at 4).

    30. "It is well-established that a 'Sheriff can have no respondeat superior liability for a section 1983 claim.'"  <u>Weaver v. Mobile County</u>, 228 Fed. Appx. 883, 886 (11th Cir. 2007) (unpublished)[6] (quoting <u>Marsh</u>, 268 F.3d at 1035).  <u>See also</u> <u>Edwards v. Alabama Dep't of Corrs.</u>, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory of *respondeat superior* is not sufficient to support [plaintiffs'] § 1983 claim. . . .") (citing <u>Monell v. Department of Soc. Servs. of City of New York</u>, 436 U.S. 658, 694 (1978)).

    31. "In order to state a claim upon which relief can be granted in a § 1983 action, Plaintiff must establish a causal connection between each defendant's 'actions, orders, customs, policies, or breaches of statutory duty and the alleged deprivation of his constitutional rights.'"  <u>Rodgers v. Moore</u>, 2009 WL 2567849, *6 (S.D. Ala. 2009) (quoting <u>Frankum v. Chapman</u>, 2009 WL 1118875, *3 (S.D. Ala. 2009)).

    32. "[S]upervisory liability under § 1983 occurs either when the supervisor

---

    [6] "Pursuant to Eleventh Circuit Rule 36-2, unpublished opinions are not considered binding precedent, but may be cited as persuasive authority."  <u>Lanier Constr., Inc. v. Carbone Props. of Mobile, LLC</u>, 253 Fed. Appx. 861, 865 n.5 (11th Cir. 2007) (unpublished).

personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

33. "The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Id. (citations omitted).

34. "Alternatively, the causal connection may be established when a supervisor's 'custom or policy . . . result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" Id. (citations and internal quotation marks omitted).

35. In such instances, Plaintiff must show that the policy or custom was "the 'moving force [behind] the constitutional violation.'" Pinkney v. Davis, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (quoting Oklahoma City v. Tuttle, 471 U.S. 808, 820 (1985)).

36. "Thus, it is clear that not only must there be some degree of 'fault' on the part of [Defendant] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." Id. (citations omitted).

37. In his Complaint, Plaintiff attests, under penalty of perjury, that he asked

15

Sheriff Lovette to take him to the doctor, and Sheriff Lovette refused; that Sheriff Lovette telephoned Dr. Brian Claytor and instructed him not to prescribe Plaintiff any further pain medication; that, in September, 2008, when Plaintiff was transferred back to the Choctaw County Jail from the Bibb County Correctional Facility for a court appearance, Sheriff Lovette refused to give Plaintiff his medication for approximately seven days; and that Sheriff Lovette did not have inmates at the jail tested for tuberculosis.  (Doc. 1 at 8-11).

38. Thus, for the purposes of a summary judgment motion, Plaintiff has established a causal connection between Sheriff Lovette and the alleged deprivation of medical care.

39. With respect to Plaintiff's conditions of confinement claim, however, Plaintiff does not allege personal participation by Sheriff Lovette; he does not allege a policy or custom of Sheriff Lovette's that led to this alleged unconstitutional deprivation; nor does he allege a history of widespread abuse that would put Sheriff Lovette on notice of the need to correct this alleged deprivation.  (Doc. 1 at 4, 7-9; Doc. 45 at 11).

40. Because there is no evidence, nor even an allegation, of a causal connection between Defendant Lovette and Plaintiff's alleged unconstitutional confinement in the holding cell, Plaintiff's conditions of confinement claim against Sheriff Lovette fails as a matter of law.[7]

_____

[7] In addition, Plaintiff appears to assert a denial of access to courts claim against Sheriff Lovette based on his allegation that, on January 3, 2008, he personally asked Sheriff Lovette if he could go to the law library, and Sheriff Lovette "said no."  (Doc. 1 at 9).  Assuming Plaintiff's allegations as true, his claim fails as a matter of law inasmuch as Plaintiff does not allege an injury resulting from this alleged deprivation.  See Al-Amin v. Smith, 511 F.3d 1317, 1332 (11th Cir. 2008) (a claim for denial of meaningful access to the courts requires a prisoner to establish that he has suffered an actual injury "such as a denial or dismissal of a direct appeal, habeas

B.    Plaintiff's Medical Care Claim.

41. As discussed above, Plaintiff claims that he was denied adequate medical care for his fractured hand while incarcerated at the Choctaw County Jail.

42. Specifically, Plaintiff claims that: (1) Sheriff Lovette refused to take him to the doctor when he re-fractured his hand in January, 2008; (2) in March, 2008, after Plaintiff had surgery to repair the re-fracture, Sheriff Lovette telephoned Dr. Brian Claytor and told him not to prescribe Plaintiff any additional pain medication; (3) in September, 2008, when Plaintiff was transferred back to the Choctaw County Jail from the Bibb County Correctional Facility for a court appearance, Sheriff Lovette refused to give Plaintiff his "I.N.H." and Zoloft medication for approximately seven days; and (4) Sheriff Lovette did not have inmates at the jail tested for tuberculosis.  (Doc. 1 at 8-11).

43. In addition to the allegations directed against Sheriff Lovette, Plaintiff also claims that he was denied adequate medical care by the jail staff in that: (5) they took him to the doctor approximately seven weeks too late to have his cast removed, causing his little finger to grow over his ring finger; (6) they did not take him to the doctor on August 16, 2007, November 14, 2007, December 2, 2007, December 18, 2007, December 27,

---

petition, or civil rights case that results from actions of prison officials.") (quoting Wilson v. Blankenship, 163 F.3d 1284, 1291 (11th Cir. 1998) (recognizing the type of underlying actions to include "direct or collateral appeals" of criminal convictions).

Similarly, with respect to Plaintiff's complaint that Sheriff Lovette threatened to hit him with a broom and have his probation revoked if he broke his hand again (Doc. 1 at 8-9), assuming Plaintiff's allegations as true, "[v]erbal abuse and harassment" do not violate the Eighth Amendment.  Pratt v. Reid, 2009 WL 2857891, *1 (M.D. Fla. 2009) (citing Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997)).

2007, and January 7, 2008, when he asked to go; and (7) both times that he fractured his hand, the jail staff failed to give him all of his prescription pain medication.  (Doc. 1 at 4, 9-10).

44. Whether considered separately or *in toto*, Plaintiff's allegations fail to establish a violation of his constitutional right to adequate medical treatment.

(i)     Denial of and Delay in Doctor Visits.

45. For purposes of Defendant's Motion for Summary Judgment, the Court assumes that a fractured hand is a "serious" medical condition and that Plaintiff has satisfied the objective element of his medical care claim.  Thus, the Court turns to the subjective element of Plaintiff's medical care claim.

46. Plaintiff alleges that, between August, 2007, and January, 2008, he requested that he be taken to the doctor six different times and was refused.  Moreover, the jail staff was seven weeks late taking him to see Dr. Guinn to have his cast removed.  (Doc. 1 at 7; Doc. 36, att. 5 at 19, 25).

47.  Even if true, Plaintiff's allegations fail to establish a constitutional violation because there is no evidence that the denial or delay related to Plaintiff's doctor's visits was the result of deliberate indifference by Defendant and that the denial or delay caused Plaintiff's injuries.

48. The record shows that, on July 17, 2007, Plaintiff intentionally struck a steel wall at the jail and fractured his right hand, specifically, the fifth metacarpal of his right

18

hand.  (Doc. 36, att. 5 at 26; Doc. 45 at 22).

49. The following day, July 18, 2007, Plaintiff was taken to see Dr. Keith Guinn, who took x-rays and put Plaintiff's hand in a splint pending confirmation of a suspected fracture.  (Doc. 36, att. 5 at 5, 25).

50. On July 19, 2007, Plaintiff returned to Dr. Guinn's office and received a short arm cast.  (Id. at 8, 24).

51. Plaintiff returned to Dr. Guinn for follow up care and x-rays on August 7, 2007, August 22, 2007, and September 5, 2007.  (Id. at 20-23).

52. At each follow up examination, Dr. Guinn noted that Plaintiff was not taking care of his cast, remarking: "poor cast care;" "very poor cast care;" "poor [patient] care;" "take care of cast!"  (Id.).

53. On August 22, 2007, Dr. Guinn noted that Plaintiff was developing "some mild palmar deformity" at the fifth metacarpal of the little finger which had increased "from last office visit and . . . from 1st setting where there was great alignment."[8]  (Id. at 21).

54. Dr. Guinn further noted that Plaintiff had "trimmed" his cast, which resulted in a "decrease in support."  (Id.).

55. Dr. Guinn reapplied Plaintiff's cast and instructed Plaintiff about the importance of cast care for the outcome of his fracture, as well as a "possible poor outcome now."  (Id.).

---

[8] Plaintiff states that his little finger was "growing over" his ring finger.  (Doc. 1 at 10).

56. On September 5, 2007, Dr. Guinn again saw Plaintiff for a follow up examination and noted that Plaintiff had "torn off" part of his cast "so [that] he could write." (Id. at 20).

57. Plaintiff was to return to Dr. Guinn in two weeks, on September 19, 2007, but did not return until November 8, 2007, approximately seven weeks late for his appointment. (Id. at 19).

58. Dr. Guinn removed the cast, took an x-ray, and noted that Plaintiff's fracture was healed but there was a "possible permanent . . . atrophy of muscle." (Id.). He instructed Plaintiff to do range of motion exercises to build strength in his hand. (Id.).

59. On January 23, 2008, Plaintiff again intentionally struck a steel wall at the jail with his right hand in a deliberate attempt to re-fracture it and was taken back to Dr. Guinn for treatment of his injuries. (Id. at 31).

60. Dr. Guinn noted that the incident was "no accident;" "[patient] hit hand on a wall - intentionally;" "patient states that he tried/intentionally tried to break his hand." (Id. at 31).

61. Plaintiff's medical records show that he re-fractured the 5th metacarpal on his right hand. (Id.).

62. Dr. Guinn splinted Plaintiff's hand and referred him to an orthopedist, Dr. Brian Claytor at the University Orthopedic Clinic in Tuscaloosa, Alabama. (Doc. 36, att. 6 at 2, 10).

20

63. Dr. Claytor saw Plaintiff two days later, on January 25, 2008, noting "a displaced and slightly angulated fracture of the right fifth metacarpal." (Id. at 7).

64. Dr. Claytor noted that the alignment of the fifth metacarpal was "very sub-optimal," "with significant angulation and mal-rotation," but that it was "difficult to determine how much of this was present as a result of his first fracture and how much is due to the new fracture." (Id. at 10).

65. On February 6, 2008, Dr. Claytor performed surgery, placing pins in Plaintiff's right hand to correct the re-fracture. (Doc. 36, att. 6 at 10, 12-13).

66. On February 13, 2008, Dr. Claytor saw Plaintiff for a follow up examination and noted that the overall alignment of Plaintiff's finger appeared "appropriate," "acceptable and much improved compared to prepoperative levels." (Id. at 13).

67. Despite the favorable outcome of Plaintiff's surgery, on February 21, 2008, Plaintiff again intentionally struck a steel wall at the jail multiple times with his right hand and was taken to Dr. Guinn for treatment of his injuries. (Doc. 36, att. 5 at 32-33).

68. Dr. Guinn's notes reflect: "[patient] reports that he fell on his hand . . . He felt that the pins 'burned and were out of place' so he hit his hand against the wall multiple times to 'put them back in place.'" (Id. at 14, 33).

69. Dr. Guinn noted that Plaintiff was to follow up with Dr. Claytor and included the following remark to Dr. Claytor: "feel patient is obviously at high risk for poor outcome in light of his history of self-mutilation." (Id.).

70. On March 5, 2008, Dr. Claytor examined Plaintiff, and his notes reflect that Plaintiff told him that "he has fallen a few times and landed on that hand."  (Doc. 36, att. 6 at 14).

71. Dr. Claytor further noted: "[o]verall fracture remains in acceptable alignment although I think some of the alignment has been lost due to the patient's repeated injuries whether these are intentional or unintentional."  (Id.).

72. On March 19, 2008, Dr. Claytor saw Plaintiff and removed the pins from his hand, noting that the "[a]lignment overall is good."  (Id. at 37).

73. Dr. Claytor further noted: "I think we need to keep him in a splint since he tends to frequently injure his hand either accidentally or intentionally at the jail."  (Id.).

74. Dr. Claytor followed up with Plaintiff again on April 1, 2008, and noted that the fracture was healing and that overall alignment "remains acceptable."  (Id. at 15).

75. Dr. Claytor saw Plaintiff one final time on April 22, 2008, noting that the fracture had healed and that Plaintiff had "some mild malrotation" of the fifth metacarpal but that "the final alignment is much improved."  (Id. at 17).

76. The record establishes that the staff at the Choctaw County Jail repeatedly took Plaintiff to the doctor for treatment of his fractured right hand, not only the first time that he intentionally hit his hand against a wall and fractured it, but also the second time, and the third time that he injured it.

77. Plaintiff was treated repeatedly and regularly by Dr. Guinn, as well as Dr.

22

Claytor, an orthopedic surgeon, who performed surgery to attempt to correct the re-fracture.

78. Assuming, as Plaintiff alleges, that he made additional requests for doctor's visits that were denied,[9] there is no evidence that those denials were the result of deliberate indifference by Defendant or the jail staff.

79. The Court also rejects Plaintiff's allegations that the seven-week delay in having his cast removed establishes a constitutional violation.

80. Plaintiff's injury in this case was not life threatening.  He had a fractured hand.

81. There is no evidence, let alone verifying medical evidence, that the delay in having his cast removed had any detrimental effect on his medical condition or resulted in any permanent injury.  Hill, 40 F.3d at 1188 (emphasis in original).

82. To the contrary, the only medical evidence establishing a cause for Plaintiff's initial injuries, as well as possibly permanent injury to his hand, is the evidence of repeated and intentional self-mutilation.

83. Having considered all of the evidence related to Defendant's alleged failure to provide adequate medical care for Plaintiff's hand, the Court is satisfied that the evidence fails to establish deliberate indifference on the part of Defendant or the jail staff at the

---

[9] Although Plaintiff complains that he was not taken to the doctor on August 16, 2007, November 14, 2007, December 2, 2007, December 18, 2007, December 27, 2007, and January 7, 2008, when he requested to go, he was taken to the doctor many other times prior and subsequent to those dates, as discussed herein.   (Doc. 36, att. 5 at 5, 18).

Choctaw County Jail and fails to establish that any alleged deprivation caused Plaintiff's injuries.

84. Thus, Plaintiff's allegations against Defendant Lovette related to delay in or denial of Plaintiff's requests for additional doctors visits fail to establish a constitutional violation as a matter of law.

(ii)   <u>Failure to Dispense Pain Medication</u>.

85. Next, Plaintiff alleges that the jail staff failed to dispense all of his pain medication and that Sheriff Lovette instructed Dr. Claytor not to refill his pain medication.  These allegations likewise fail to establish a constitutional violation.

86. In his Complaint, Plaintiff states that both times that he fractured his hand, the jailers did not give him all of his pain medication.[10]  (Doc. 1 at 9-10).

87. In addition, Plaintiff alleges that, when he ran out of hydrocodone on February 25, 2008, and asked Sheriff Lovette to call Dr. Claytor to get the medication refilled, the Sheriff refused.  (<u>Id.</u>; Doc. 45 at 14).

88. Thus, Plaintiff had a family member call Dr. Claytor and ask for a refill.  (Doc. 45 at 14).

89. The medical records from Dr. Claytor reflect that, on March 19, 2008, Plaintiff

---

[10] Specifically, Plaintiff states that, over a period of several days in March, 2008, he should have received twenty-four doses of hydrocodone, but he only received sixteen.  (Doc. 45 at 5).  In addition, in August, 2007, on five different days, he missed his 11:00 a.m. dose of pain medication, although he received his 6:00 a.m. and 5:00 p.m. doses.  (<u>Id.</u> at 6).

24

requested a refill of his pain medication, and Dr. Claytor responded: "the patient is requesting refill on his narcotic medications today.  I told him that after our last refill I was contacted by the Sheriff's Office who asked that any further medication request and refills come from his office only.  I told the patient we have not received any request from his office for any sort of medication refills and that I was trying to comply with the Sheriff's request in that regard."  (Doc. 36, att. 6 at 37).

90. The medication administration record from the jail indicates that, after Plaintiff injured his lower back and buttocks in a fall on August 14, 2007, which was approximately four weeks after he fractured his hand the first time, he was given meloxicam and methocarbamol for pain, and received one, or sometimes both, of those medications at least once a day, and sometimes multiple times a day, from August 15, 2007, through September 12, 2007.  (Doc. 36, att. 10 at 6-7, Jail Medication Administration Record; Doc. 36, att. 4 at 9, Hill Hospital Records).

91. There is no evidence that Dr. Guinn, who was treating Plaintiff for his hand fracture that occurred on July 17, 2007, or any other physician, had prescribed Plaintiff pain medication for his hand.  Moreover, there is no evidence that the physician who was treating Plaintiff for his lower back injury had prescribed Plaintiff pain medication after September 12, 2007.

92. The medication administration record from the jail also indicates that, in February, 2008, following his hand surgery, Plaintiff received hydrocodone several times a day from February 6, 2008, the date of his surgery, through March 6, 2008, one month

25

after his surgery.  (Doc. 36, att. 10 at 2-5).

93. There is no evidence that Dr. Claytor, who was treating Plaintiff after his surgery, or any other physician, prescribed Plaintiff anything for pain after March 6, 2008, nor is there medical evidence that Plaintiff needed pain medication after March 6, 2008.

94. While Plaintiff alleges that, after his surgery in February, 2008, Sheriff Lovette instructed Dr. Claytor not to refill his prescription for hydrocodone, the record indicates that Sheriff Lovette merely asked Dr. Claytor to wait until he was notified that Plaintiff needed a refill of his narcotic prescription, which instruction was in response to Plaintiff's family member calling Dr. Claytor to request a refill.  (Doc. 1 at 10; Doc. 36, att. 6 at 37).

95. Having considered the evidence related to Defendant Lovette's instruction to Dr. Claytor regarding refilling Plaintiff's pain medication and the jail staff's alleged failure to dispense all of Plaintiff's pain medication, the Court is satisfied that the evidence does not suggest an "unnecessary and *wanton* infliction of pain," Hill, 40 F.3d at 1187 (emphasis added), nor does it suggest that the delay in receiving, or failure to receive, pain medication detrimentally exacerbated Plaintiff's medical condition.[11]  Id.

96. Thus, Plaintiff's allegations related to the denial of or delay in receipt of pain

---

[11] Plaintiff also alleges that Sheriff Lovette failed to dispense his "I.N.H." and Zoloft medication for seven days while he was incarcerated at the Choctaw County Jail in September, 2008, awaiting a court appearance.  However, as with his allegations related to his pain medication, Plaintiff has failed to show that this alleged deprivation was the result of "deliberate indifference" or that it detrimentally exacerbated his medical condition.  Hill, 40 F.3d at 1187. Thus, these allegations likewise fail to establish a constitutional violation.

medication fail to establish a constitutional violation as a matter of law.

        (iii)    <u>Failure to Test for Tuberculosis</u>.

97. Next, Plaintiff alleges that Sheriff Lovette failed to have inmates at the jail tested for tuberculosis.

98. The law is clear that "[a] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837-38.

99. In this case, there is no evidence that any inmate at the Choctaw County Jail had tuberculosis, that Plaintiff was exposed to that inmate, and that Defendant Lovette knew of and disregarded this excessive risk to Plaintiff's health and safety.

100. Although Plaintiff claims that he tested positive for tuberculosis at Kilby Correctional Facility and had to take preventative medication, even if true, there is no evidence that the positive test result was caused by exposure to tuberculosis at the Choctaw County Jail. (Doc. 1 at 9; Doc. 45 at 15).

101. Because Plaintiff has failed to show that Defendant Lovette's failure to test inmates at the jail for tuberculosis was the result of deliberate indifference and that Plaintiff was injured as a result of this alleged deprivation, Plaintiff's claim fails as a matter of law.

102. "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Reed v. Barnes, 2009 WL 857078, *7 (S.D. Ala. 2009) (quoting Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)).

103. Having considered the evidence related to Plaintiff's allegations against Sheriff Lovette for denial of adequate medical care while incarcerated at the Choctaw County Jail, the Court is satisfied that Plaintiff has failed to satisfy his burden with respect to the subjective element of this claim.

104. Therefore, this Defendant is entitled to summary judgment on Plaintiff's medical care claim as a matter of law.

C.    Conditions of Confinement.

105. As discussed above, Plaintiff claims that he was denied humane conditions of confinement while detained in the holding cell at the Choctaw County Jail for approximately twenty-eight days in August and September, 2007, and for three to four hours on January 21, 2008.  (Doc. 1 at 4, 7; Doc. 45 at 11).

106. Specifically, Plaintiff alleges that, beginning August 14, 2007, he was forced to endure approximately twenty-eight days in an 8' x 4' cell,[12] without a bunk to sleep on, without running water, without lights, and with only a hole in the floor for "human waste."  (Doc. 1 at 4, 7-8; Doc. 45 at 9, 18).

---

[12] Plaintiff also states that he was not allowed to take a shower until the fifteenth day.  (Doc. 1 at 7).

107. According to Defendant Lovette, the holding cell at the Choctaw County Jail is used for inmates with disciplinary problems.  (Doc. 36, att. 1 at 2).

108. The cell is approximately 10' x 15' and "has an antechamber between two locked doors that is approximately five feet by fifteen feet that is used by an inmate placed in the holding cell for sleeping.  When in the antechamber, the inmate is separated from the holding cell by a solid door that is not locked to allow the inmate access to the holding cell."  (Id.).

109. The cell has a urinal in the floor, and inmates assigned to the holding cell are allowed out of the holding cell when they need to defecate.  (Id.).

110. As discussed above, the Eighth Amendment requires that prison officials ensure that inmates receive adequate food, clothing, shelter, medical care, safety, and sanitation.  Farmer, 511 U.S. at 832; Hamm, 774 F.2d at 1572.

111. In this action, Plaintiff does not allege that he was deprived of food or water.

112. Rather, he complains that his food was served without rubber gloves; his food tray was placed on the floor before being passed to him; and he was at the mercy of the trusties for water.   (Doc. 1 at 4, 11).

113. Plaintiff does not allege that he was unsheltered from the elements or denied clothing, sheets, or a blanket.

114. Rather, he complains that he did not have a bunk on which to sleep and that, when he urinated on his clothing, sheets, and blanket, he had to hang them to dry and

continue using them.[13]  (Doc. 45 at 18).

115. Plaintiff further alleges that he had to walk around in his own waste when the urinal in the floor of the cell overflowed.  (Doc. 1 at 8).

116. In condition of confinement cases, the Court must assess "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."  Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (emphasis in original).

117. "While an inmate 'need not await a tragic event' before seeking relief, . . .  he must at the very least show that a condition of his confinement 'pose[s] an unreasonable risk of serious damage to his future health' or safety. . . ."  Id. (citations omitted).

118. For the most part, Plaintiff's allegations in this case concern uncomfortable conditions of confinement and less than ideal sanitation practices which do not rise to the level of a constitutional violation.

119. Of particular concern to the Court, however, is Plaintiff's assertion that he had to walk around in his own waste when "the hole in the floor," *i.e.*, the urinal, "would stop up."  (Doc. 1 at 7-8).

---

[13] Plaintiff does allege that, on January 21, 2008, when he was detained in the holding cell for three to four hours, he was deprived of sheets and a blanket for that period of time.  (Doc. 45 at 9, 11).

120. The evidence shows, as discussed above, that the holding cell in which Plaintiff was detained is divided into two parts, with an antechamber that is accessible to the inmate.  (Doc. 36, att. 1 at 2).

121. Although Plaintiff alleges that the urinal overflowed and that he had to walk around in his own waste, he has presented no evidence of the frequency or duration of the overflows and  his exposure thereto.  In fact, Plaintiff has presented no evidence, nor even alleged, that he was unable to get away from the wastewater by going into the other chamber of the holding cell when the urinal overflowed.

122. Under the circumstances alleged in this case, Plaintiff has failed to show that the conditions of confinement in the holding cell posed "an unreasonable risk of serious damage to [his] future health or safety" or were "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  Chandler, 379 F.3d at 1289 (emphasis in original).  Cf. White v. Marshall, 2008 WL 4826283, *3, *8-9 (M.D. Ala. 2008) (unpublished) (holding that the plaintiff's confinement for thirty days in a strip cell with only a drain in the floor for urinating, cold sandwiches three times a day, no clothing except for a paper gown, no mattress for twenty-four days, no blanket, no wash basin, no personal hygiene items, no lights, no ventilation, and no shower or exercise for fourteen days were not deprivations of "the minimal civilized measures of life's necessities."); Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996) ("not every overflowed toilet in a prison amounts to a constitutional violation.") (inmate's exposure for four days to raw sewage from a toilet that overflowed in his isolation cell did not amount to cruel

and unusual punishment).

123. Considering all of the circumstances alleged, the Court is satisfied that
Plaintiff has failed to establish a deprivation of the "the minimal civilized measure of
life's necessities."  Thus, he has failed to meet the objective component of his Eighth
Amendment claim.  <u>Rhodes</u>, 452 U.S. at 347.

124. In addition to failing to meet the objective component of his conditions of
confinement claim, Plaintiff has failed to satisfy the subjective element of his claim by
showing that Defendant Lovette was "deliberate[ly] indifferen[t]" to a substantial risk of
serious harm to his health or safety.  <u>Farmer</u>, 511 U.S. at 828-29.

125. There is no evidence that Defendant Lovette knew about the problem with the
urinal overflowing in the holding cell, or any other allegedly unconstitutional condition of
confinement, and simply disregarded it.

126. Finally, Plaintiff has failed to show that the conditions of his confinement
caused him compensable injury.  <u>See</u> <u>Marsh</u>, 268 F.3d at 1028 ("[a] plaintiff must also
show that the constitutional violation caused his injuries.").

127. The only injury alleged by Plaintiff as a result of his conditions of
confinement is that he became depressed as a result of "the way [he] was treated at the
[Choctaw] County Jail *and in court*."  (Doc. 1 at 6) (emphasis added).

128. This vague assertion, which includes an allegation of maltreatment by the
state court, is insufficient to establish causation between Plaintiff's depression and his

detention in the Choctaw County Jail holding cell.

129. Even assuming a causal connection, however, Plaintiff's claim still fails inasmuch as there can be no §1983 claim for compensatory damages for mental or emotional injury suffered while in custody without a prior showing of a physical injury. 42 U.S.C. § 1997e(e).[14]

130. Because Plaintiff has alleged no physical injury and has made no prayer for punitive or nominal damages, his claim for relief related to his conditions of confinement claim fails as a matter of law.

131. Having considered all of the evidence related to Plaintiff's conditions of confinement claim,[15] the Court is satisfied that the evidence fails to establish a constitutional violation.

## V. CONCLUSION

Based on the foregoing, it is recommended that the Motion for Summary Judgment of Defendant, Sheriff James Lovette (Docs. 36, 37) be granted, that Plaintiff's action be dismissed with prejudice, and that judgment be entered in favor of Defendant Lovette on all claims.

The instructions which follow the undersigned's signature contain important

---

[14]  42 U.S.C. § 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

[15] As discussed above, Plaintiff's conditions of confinement claim against Sheriff Lovette also fails as a matter of law because it is based on *respondeat superior* liability.

information regarding objections to the report and recommendation of the Magistrate

Judge.

DONE this 1st day of October, 2009.

 s/WILLIAM E. CASSADY                
UNITED STATES MAGISTRATE JUDGE

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.    Objection.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.    Transcript (applicable where proceedings tape recorded).  Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.